## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

KELLY ANDERSON, AUDREY MCCAULEY,
and TANIA POKORSKI, individually and
on behalf of all others similarly situated,

        Plaintiffs,                     CLASS ACTION COMPLAINT
                                            **JURY TRIAL DEMANDED**

v.

ALMAY, INC. and REVLON, INC.,

        Defendants.
_____/

### CLASS ACTION COMPLAINT

Plaintiffs Kelly Anderson, Audrey McCauley, and Tania Pokorski ("Plaintiffs") bring this Class Action Complaint against Defendants Almay Inc. and Revlon, Inc. (collectively, "Defendants"), individually and on behalf of all others similarly situated, and complain and allege upon personal knowledge as to themselves and their own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by their attorneys:

### NATURE OF THE ACTION

1.      This is a civil class action brought by Plaintiffs on behalf of all consumers who purchased Almay products, which are marketed as clean, healthy, and non-toxic cosmetic products but which contain harmful per- and polyfluoroalkyl substances ("PFAS") (collectively, the "Products").[1]

_____

[1] The action concerns all Almay products that contain PFAS, including but not limited to, Almay Skin Perfecting Healthy Biome Makeup™, Almay Multi-Benefit Mascara™, Almay Clear Complexion™ Concealer, Almay Clear Complexion™ Makeup, Almay Goddess Gloss™, and Almay Truly Lasting Color™ Liquid Makeup.  As alleged herein, Defendants conceal the

2.      Almay has been a leading cosmetic brand since the 1930s, and over the course of nearly a century it has gained consumer trust by actively cultivating its image as a brand that is committed to manufacturing and selling affordable cosmetic products that are safe, clean, and non-toxic.[2]  Defendants formulate, manufacture, market and sell a variety of cosmetic products under the Almay brand name, including foundation, concealer, mascara, and lipstick. Almay products are widely available at grocery stores, drug stores, and mass market retailers across the United States.

3.      Almay was the first brand to create a hypoallergenic makeup that eliminated ingredients known to cause irritation to the skin. While the brand has evolved over time, it has always identified and marketed itself as a leader in developing products that "[do] no harm" to the skin or the planet.[3]

4.      Almay's marketing strategy capitalizes on an ever increasing consumer demand for "clean" beauty products, which are generally understood to have eliminated ingredients shown or suspected to be harmful to human health.

5.      Almay specifically markets itself as a clean makeup brand, which it defines, in part, as being "extremely selective" about what ingredients are included in its Products and using only "safe, effective ingredients and smarter formulas" which are "rigourous[ly] tested."[4] Another example of Almay's marketing focus on clean beauty is its promise to limit the use of ingredients that could impact the skin and eyes, even when those ingredients are not otherwise regulated within

---

inclusion of PFAS in the Products from consumers.  Accordingly, discovery will reveal the exhaustive list of substantially similar Almay products that are included in this action.

[2] *These Are Our Values*, ALMAY, https://www.almay.com/Editorial-Content/What-We-Stand-For (last visited Mar. 15, 2022).

[3] *Id*.

[4] *These Are Our Values*, ALMAY, https://www.almay.com/Editorial-Content/What-We-Stand-For (last visited Mar. 15, 2022).

the industry, stating: "We currently use only 500 of the 10,000 ingredients available to cosmetics companies and are determined to keep narrowing that list."[5]  Almay also identifies itself as a "sustainable" brand, with a mission to minimize its impact on the planet.[6]

6.      All of these marketing promises in the aggregate promote Almay's clean beauty promise.

7.      The clean beauty movement has caused a revolution in the beauty industry, and is the result of increased consumer demand for products that contribute to their overall health and wellness goals.  Over the last 10-15 years, clean beauty products have emerged as key players in the ever-growing cosmetics market. Globally, the clean beauty market is estimated to reach $22 billion by 2024, becoming a fast-growing category within the cosmetics industry.[7]

8.      It is no surprise that cosmetic companies like Almay are eager to maintain their foothold,  and increase their market share, in the incredibly lucrative and expanding clean beauty market.

9.      In 1987, Almay was purchased by Revlon, one of the world's leading cosmetic companies.[8]  As leaders in the cosmetic and beauty industry, Defendants know that consumers are focused on what they put on their face and how the products they use impact their health.[9] Through

---

[5] *Id.*

[6] *Id.*

[7] Kristin Larson, *Shopper Demand for Clean Beauty and Increased Transparency Continues*, FORBES (June 30, 2021, 6:47 PM), https://www.forbes.com/sites/kristinlarson/2021/06/30/shopper-demand-for-clean-beauty-and-increased-transparency-continues/.

[8] *Id.*; Fraser Sherman, *The History of Revlon Cosmetics*, BIZFLUENT (Feb. 6, 2020), https://bizfluent.com/facts-5828012-sells-breck-shampoo-.html; C. Shardae Jobson, *Almay is Trying to Undo Years of White-Washing Its Beauty Campaigns*, FASHIONISTA (Apr. 5, 2018), https://fashionista.com/2018/04/almay-inclusive-diverse-makeup-brand-controversy.

[9] *The Clean Beauty Trend is More Than Skin Deep*, NIELSENIQ (July 29, 2021), nielseniq.com/global/en/insights/education/2021/the-clean-beauty-trend-is-more-than-skin-deep/.

Defendants' uniform marketing of the Products as clean and free from harmful chemicals, as evidenced by the statements further identified herein, Defendants have attempted to capitalize on this consumer demand.

10.     Consumers pay the price they do—and Plaintiffs paid the price they did—for Almay's Products based upon Defendants' pervasive marketing that centers on its core values of being clean, non-toxic, and good for the skin.

11.     In reality, the Products are not clean, healthy, or non-toxic as they contain potentially harmful chemicals that are in no way clean or healthy.

12.     Defendants do not disclose that the Products contain PFAS, a chemical which is entirely inconsistent with Defendants' marketing and advertising, and the disclosure of which would inevitably impact their sales and standing in the clean beauty market. No reasonable consumer would deem the Products clean if they knew that they contained harmful PFAS.

13.     Defendants' failure to disclose the presence of PFAS in the Products is driven by Defendants' desire to maximize sales revenue.

14.     Defendants' misconduct is uniform and widespread.  Defendants formulate, design, manufacture, market, advertise, distribute, and sell their Almay-branded Products to consumers throughout the United States, with their operations based in the State of New York.

15.     Defendants distribute and sell the Products on the Almay website and through various authorized brick-and-mortar and online retailers such as CVS, Kroger, Target, Walgreens, Walmart,  and Amazon.

16.     Defendants do not disclose on the Almay website, in the ingredients, on the packaging, or in any other manner, that the Products contain PFAS; however, Plaintiffs tested each type of the Products they purchased, and each contained PFAS.

17.    Defendants' concealment of this material information makes their false and misleading marketing even more egregious.

18.    Defendants' misrepresentations are intentional, or otherwise entirely careless, and render the Products worthless or less valuable.  If Defendants had disclosed to Plaintiffs and putative Class Members that the Products contained PFAS, Plaintiffs and putative Class Members would not have purchased the Products or they would have paid less for them.

19.    Alternative formulations, designs and materials were available to Defendants at the time they formulated, designed, and manufactured the Products. Defendants have sufficient resources to adopt such alternative formulations and designs in order to manufacture and sell Products which are consistent with Defendants' representations.

20.    Plaintiffs seek damages and equitable remedies for themselves and for the proposed Classes.

## JURISDICTION AND VENUE

21.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (1) there are 100 or more putative Class Members; (ii) the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs; and (iii) there is minimal diversity because Plaintiffs and Defendants are citizens of different states.  This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

22.    This Court has personal jurisdiction over each Defendant because each is headquartered in this District, has substantial aggregate contacts with this District, including engaging in conduct, such as material representations and omissinos, that has a direct, substantial,

reasonably foreseeable, and intended effect of causing injury to persons throughout the United States, and purposely availed itself of the laws of the United States and the State of New York.

23.     In accordance with 28 U.S.C. § 1391, venue is proper in this District because a substantial part of the conduct giving rise to Plaintiffs' claims occurred in this District, Defendants transact business in this District, and Defendants have intentionally availed themselves of the laws and markets within this District.

## PARTIES

24.     Plaintiff Kelly Anderson is a resident and citizen of Rochester, Minnesota, who purchased and used the Products within the relevant time period.

25.     Plaintiff Audrey McCauley is a resident and citizen of Jacksonville, Florida, who purchased and used the Products within the relevant time period.

26.     Plaintiff Tania Pokorski is a resident and citizen of Carson, California, who purchased and used the Products within the relevant time period.

27.     Defendant Almay, Inc. is incorporated in Delaware with its principal place of business located at 625 Madison Avenue, New York, NY 10022. It is a wholly-owned subsidiary of Defendant Revlon, Inc.

28.     Defendant Revlon, Inc. is incorporated in Delaware with its principal place of business located at 1 New York Plaza, New York, New York, 10004.

## FACTUAL ALLEGATIONS

**PFAS**

29.     Plaintiffs' independent testing of the Almay Products revealed the presence of organic fluorine, an indicator that the Products contain PFAS.[10] Testing for organic fluorine is an industry-standard method for assessing the presence of PFAS in a sample.

30.     PFAS are a category of highly persistent and potentially harmful human-made chemicals.[11]

31.     While there are thousands of varieties of PFAS chemicals in existence, all PFAS contain carbon-fluorine bonds—one of the strongest in nature—which makes them highly persistent in the environment and in human bodies.[12]

32.     PFAS chemicals are sometimes called "forever chemicals" and have been associated with a variety of negative health effects for humans and the environment.

33.     Humans can be exposed to PFAS through a variety of ways, including ingestion, inhalation, and skin absorption.[13]

34.     According to the FDA, PFAS are "intentionally added" to products such as lotions, cleansers, nail polish, shaving cream, foundation, lipstick, eyeliner, eyeshadow, and mascara "to

---

[10] Whitehead et al., *supra* note 3 (PFAS concentrations were detected by screening for total fluorine); *Testing for PFAS in food packaging*, Supply Chains Solutions Center, https://bit.ly/3fNPHwF (last visited Dec. 16, 2021) (recommending that companies screen for PFAS "using a total fluorine method ... [that] measures all forms of PFAS"); Jen Dickman et. al., *Packaged in Pollution: Are food chains using PFAS in packaging?,* https://saferchemicals.org/packaged-in- pollution/ (testing for PFAS using total fluorine amounts) (last visited Dec. 16, 2021).

[11] *PFAS Explained*, EPA, https://www.epa.gov/pfas/pfas-explained (last visited Nov. 27, 2021).
[12] National Toxicology Program, *Per- and Polyfluoroalkyl Substances (PFAS)*, U.S. DEPT. OF HEALTH AND HUMAN SERVS., https://ntp.niehs.nih.gov/whatwestudy/topics/pfas/index.html (last visited Nov. 27, 2021).
[13] *Id.*

condition, smooth or make skin appear shiny."[14]  PFAS also "are added to cosmetics to increase their durability and water resistance."[15]

35.     By law, all ingredients contained within cosmetics are required to be listed on the product label, in descending order of magnitude.

36.     Common names for PFAS found in cosmetics include PTFE (polytetrafluoroethylene), perfluorooctyl triethoxysilane, perfluorononyl dimethicone, perfluorodecalin, and perfluorohexane.

37.     In order to assess the potential health risks of PFAS in cosmetics, a study was conducted in June 2021 entitled "Fluorinated Compounds in North American Cosmetics" (the "Study").  The Study analyzed more than 231 cosmetic products purchased in the United States and Canada to determine the presence of PFAS.[16]

38.     In order to analyze the presence of PFAS, the Study used a marker for PFAS—the chemical fluorine, which is different than the inorganic fluorine added to drinking water.

39.     The Study found that more than three-quarters of waterproof mascara, nearly two-thirds of foundations and liquid lipsticks, and more than half of eye and lip products had high fluorine concentrations, indicating PFAS were likely present.

40.     Despite being required by the US Food and Drug Administration to list all ingredients present in cosmetics, the Study found some 88% of the tested products failed to disclose on their labels any ingredients that would explain those chemical markers.

---

[14] Sandee LaMotte, *Makeup may Contain Potentially Toxic Chemicals Called PFAS, Study Finds*, CNN (June 15, 2021, 7:46 PM), https://www.cnn.com/2021/06/15/health/makeup-toxic-chemicals-wellness/index.html.

[15] Heather Whitehead et al., *Fluorinated Compounds in North American Cosmetics*, ENVIRON. SCI. TECHNOL. LETT. (June 15, 2021), https://pubs.acs.org/doi/10.1021/acs.estlett.1c00240.

[16] *Id.*

41.     In addition, samples from 29 of the products with the highest levels of fluorine were sent to an outside lab for an in-depth analysis that could identify 53 specific PFAS chemicals. The analysis found each of those 29 products contained at least four PFAS chemicals of concern.

42.     In 28 of the 29 products—like the Products at issue here—PFAS chemicals were not disclosed on the label.

43.     The Study explained likely reasons for the use of PFAS in makeup:

> PFAS are used in cosmetics due to their properties such hydrophobicity and film-forming ability, which are thought to increase product wear, durability, and spreadability.  Additional claimed benefits are increased skin absorption of the product and improvements in the appearance or texture of skin.[17]

44.     "We found fluorine as a surrogate for PFAS was in all sorts of cosmetics.  We didn't expect almost every cosmetic to light up like it did," said Study author Graham Peaslee, a professor of physics, chemistry, and biochemistry at the University of Notre Dame.[18]

**<u>Risks Associated with PFAS in Cosmetics</u>**

45.     "PFAS in cosmetics may pose a risk to human health through direct and indirect exposure, as well as a risk to ecosystem health throughout the lifecycle of these products."[19]

46.     Of particular concern with PFAS utilized in cosmetics "is that these classes of cosmetics are applied close to the eyes and the mouth, which could increase exposure and hence risk due to enhanced absorption and ingestion."[20]

47.     As skin is the body's largest organ,[21] subjecting it to absorption of PFAS through foundation and concealers is very concerning.

---

[17] *Id.*
[18] LaMotte, *supra* note 23.
[19] Whitehead et al., *supra* note 24.
[20] *Id.*
[21] Gary Swann, *The Skin is the Body's Largest Organ*, J. OF VISUAL COMMC'N IN MED. (Vol. 33, Nov. 19, 2010), https://doi.org/10.3109/17453054.2010.525439.

48.     A figure utilized in the Study demonstrates how PFAS in cosmetics are introduced

to the human body:



49.     As one blogger noted, in quoting a notable dermatologist:

Unfortunately, the technological innovations that PFAS helped create also came
with a price: Serious health effects.  Jennifer Herrmann, MD, FAAD, a board
certified, fellowship-trained dermatologist and dermatologic surgeon at Moy
Fincher Chipps Facial Plastics/Dermatology, says that PFAS may impact
"increased cholesterol, liver inflammation, increased blood pressure in pregnancy,
decreased birth rate of children, decreased vaccine response in children, and
increased risk of kidney or testicular cancer."[22]

50.     In 2018, Denmark's EPA performed a "Risk Assessment of Fluorinated Substances

in Cosmetic Products."  As noted in the assessment:

This project is part of the Danish Environmental Protection Agency's chemical
initiative, with the aim of assessing consumers' exposure to problematic chemistry.
. . .  The purpose of this project is to build knowledge of fluorinated substances in
cosmetic products and to clarify whether the use of cosmetic products containing
certain fluorinated substances presents a health risk to consumers.  The project
focuses on perfluoroalkyl and polyfluoroalkyl substances (PFAS), which are also
denoted fluoroalkyl substances. PFAS and other fluorinated compounds are used in
a variety of cosmetic products such as foundation, moisturizer, eyeshadow, powder,
lipstick and shaving cream.[23]

---

[22] Marie Lodi, *"Forever Chemicals" & Cosmetics: What You Need To Know About PFAS*, ROSE
INC,         https://www.roseinc.com/blogs/education/pfas-forever-chemicals-cosmetics-makeup-
explainer?_pos=1&_sid=6962ca83a&_ss=r (last visited Nov. 27, 2021).
[23] Environmental Protection Agency, *Risk Assessment of Fluorinated Substances in Cosmetic
Products*, MINISTRY OF ENVIRONMENT AND FOOD OF DENMARK 5, 6 (Oct. 2018),
https://www2.mst.dk/Udgiv/publications/2018/10/978-87-93710-94-8.pdf.

51.     As the Danish EPA explained, cosmetics such as foundation and concealer are "'leave-on' products, i.e. they are intended to stay on the skin all day, *with a consequently greater exposure expected compared to other product types that are intended to be washed off immediately after application* ('rinse-off' products)."[24]

52.     The Danish EPA further notes, "Dermal absorption is set conservatively at 70%. As mentioned earlier, the value is based on a study (Franko *et al.*, 2012) which showed that approximately 25% PFOA (as acid) was absorbed through the skin and that 45% of the substance was retained in the epidermis."[25]

53.     In a 2019 study, the National Toxicology Program finds that PFAS has adverse effects on human organ systems, with the greatest impact seen in the liver and thyroid hormone.[26]

54.     A figure from the European Environmental Agency ("EEA") shows the "[e]ffects of PFAS on human health"[27]:

---

[24] *Id.* at 8 (emphasis added).
[25] *Id.* at 11.
[26] *PFAS Explained*, *supra* note 20.
[27] *Emerging chemical risks in Europe — 'PFAS'*, EUROPEAN ENVIRONMENT AGENCY (Dec. 12, 2019, last modified Mar. 9, 2021), https://www.eea.europa.eu/publications/emerging-chemical-risks-in-europe.



55.     The EEA brief further explains that "[p]eople most at risk of adverse health impacts are those exposed to high levels of PFAS, and vulnerable population groups such as children and the elderly."[28]

56.     The Center for Disease Control's Agency for Toxic Substances and Disease Registry has recognized that exposure to high levels of PFAS may impact the immune system and reduce antibody responses to vaccines.[29]

---

[28] *Id.*

[29] Center for Disease Control and Prevenion Agency for Toxic Substances and Disease Registry, *What are the health effects of PFAS?*, U.S. DEPT. OF HEALTH AND HUMAN SERVS., https://www.atsdr.cdc.gov/pfas/health-effects/index.html (last visited Nov. 27, 2021).

57.     The danger of PFAS chemicals is well known.  On September 20, 2020, a *New York Times* article titled, "These Everyday Toxins May Be Hurting Pregnant Women and Their Babies," reported on the dangers of PFAS – particularly during gestation and in early childhood development[30]:

> Scientists think these widely used industrial chemicals may harm pregnant women and their developing babies by meddling with gene regulators and hormones that control two of the body's most critical functions: metabolism and immunity.
>
> More disturbing, PFAS can also alter levels of both mothers' and babies' thyroid hormones, which oversee brain development, growth and metabolism, and also play a role in immunity.  Prenatal PFAS exposures that disrupt metabolism and immunity may cause immediate and lasting effects on both mother and child. Women exposed to PFAS during pregnancy have higher risks of gestational diabetes and pre-eclampsia, a type of high blood pressure.  Their babies are more likely to undergo abnormal growth in utero, leading to low birth weight, and later face increased risk of childhood obesity and infections.

58.     Additionally, according to the EEA:

> Costs to society arising from PFAS exposure are high, with the annual health-related costs estimated to be EUR 52-84 billion across Europe in a recent study (Nordic Council of Ministers, 2019).  The study notes that these costs are likely underestimated, as only a limited range of health effects (high cholesterol, decreased immune system and cancer) linked to exposure to a few specific PFAS were included in the estimates.[31]

59.     This analysis has yet to be performed in the United States; however, there is no reason to believe the conclusions would differ.

60.     "The Madrid Statement," a scientific consensus regarding the persistence and potential for harm of PFAS substances issued by the Green Science Policy Institute and signed by more than 250 scientists from 38 countries, recommended the following actions in order to mitigate

---

[30] Liza Gross, *These Everyday Toxins may be Hurting Pregnant Women and Their Babies*, N.Y. TIMES (Sept. 23, 2020, updated Oct. 18, 2021) https://www.nytimes.com/2020/09/23/parenting/pregnancy/pfas-toxins-chemicals.html.
[31] *Emerging chemical risks in Europe — 'PFAS'*, *supra* note 36.

future harm: (1) discontinuing use of PFAS where not essential or safer alternatives exist; (2) labeling products containing PFAS; and (3) encouraging retailers and individual consumers to avoid products containing or manufactured using PFAS whenever possible.[32]

**The Challenged Statements**

61.     Defendants' pervasive marketing scheme includes a litany of representations related to the Products' qualities and attributes as a clean makeup brand, including, *inter alia*, the following statements (the "Challenged Statements"):

   a.   "This is Almay: effortless, clean, hypoallergenic makeup with *nothing to hide*."[33]

   b.   "We're committed to doing right by you.  Because we believe in creating makeup that, first and foremost, is based on the principle of doing no harm—not to your skin, sensitive eyes, nor the planet.  This is Almay."[34]

   c.   "We believe that transparency and information allow you to make choices you can feel confident about."[35]

   d.   "We've made it our mission to minimize our impact on the planet."[36]

   e.   "We always strive to be as clean as possible with our formulas."[37]

   f.   "We're extremely selective about what we put in our products. Out of 10,000 possible ingredients, we only use 500 (fewer than 5%)."[38]

---

[32] *The Madrid Statement*, GREEN SCIENCE POLICY INSTITUTE, https://greensciencepolicy.org/our-work/science-policy/madrid-statement/ (last visited Nov. 27, 2021).
[33] *These are our Values*, *supra* note 5 (emphasis added).
[34] *Id.*
[35] *Id.*
[36] https://www.almay.com/Editorial-Content/What-We-Stand-For
[37] *Id*.
[38] *Id*.

g.   "Our driving force toward being clean is our commitment to being hypoallergenic, which has been our core mission from day one."[39]

h.   "Our development teams and doctors...review the safety test of thousands of ingredients and consider the impact of combining them together into a formula."[40]

i.   "Almay has been changing the beauty game since 1931. In a world of heavy, highly fragranced, irritating products, chemist and founder Alfred Woititz embarked on a beauty line that defied the times."[41]

j.   "effortless.clean.hypoallergenic.cruelty free."[42]

k.   "Makeup that puts your skin first."[43]

l.   "Clean. Effortless. Hypoallergenic."[44]

m.   "Dermatologist or Opthamologist Tested."[45]

n.   "We are always evaluating and re-evaluating our ingredients."[46]

o.   "A brand that only offers makeup that loves your skin."[47]

p.   "We develop our products with careful ingredient choices and pairings."[48]

q.   "Doctor tested...to ensure that they are suitable for your skin."[49]

---

[39] *Id.*
[40] *Id.*
[41] *Id.*
[42] ALMAY (@AlmayCosmetics), TWITTER, https://twitter.com/AlmayCosmetics (last visited Mar. 17, 2022).
[43] https://www.almay.com
[44] *Id.*
[45] *Id.*
[46] *Id.*
[47] *Id.*
[48] *Id.*
[49] *Id.*

62.    Defendants' branding is also carried through its official social media channels, including the following examples, which specifically use the term "clean" to describe the brand and its Products:

a.   Twitter:[50]





[50] ALMAY (@AlmayCosmetics), TWITTER, https://twitter.com/AlmayCosmetics (last visited Mar. 17, 2022)

b.  Instagram[51]





---

[51] ALMAY (@almay), INSTAGRAM, https://www.instagram.com/almay/;
https://www.instagram.com/p/B4nLs9ehbU9/.
(last visited Mar. 16, 2022);

c.   YouTube[52]



63.     Almay's online marketing through its social media, in conjunction with the Challenged Statements, is demonstrative of the reasonable consumer's expectation that Almay is a clean beauty brand. It is then no surprise that the reasonable consumer expects Defendants' Products to be free from potentially toxic ingredients, including those ingredients known to cause harm to humans and the environment like PFAS.

64.     Reasonable consumers would consider PFAS a harmful chemical and would not expect it would be in clean beauty Products.

---

[52] ALMAY, YOUTUBE, https://www.youtube.com/user/almay/about (last visited Mar. 16, 2022).

65.     Plaintiffs' claims are economic in nature: Plaintiffs and the Classes were injured economically when they purchased the Products.

66.     As alleged herein, Plaintiffs and the putative Class Members received something worth less than what they paid for and did not receive the benefit of their bargain.  They paid for the Products, which were represented as clean, non-toxic, and safe, but the Products actually contained a chemical known to be harmful to humans and the environment.

67.     No reasonable consumer would have purchased, or paid as much, for the Products had they known the Products contained harmful ingredients linked to adverse health effects in humans.  Even more egregious, Defendants knew or should have known given the extensive testing performed on the Products that the Products were manufactured with PFAS, but chose not to disclose this material information to their consumers in an effort to persuade them they were, in fact, buying clean, healthy, non-toxic products, rather than products containing potentially harmful chemicals.  Instead, Defendants wantonly represented the Products as clean, over and over, year after year.

68.     Accordingly, Plaintiffs and putative Class Members suffered economic injuries as a result of purchasing the Products.

69.     Defendant Revlon, Inc. ("Revlon") had authority and control over Almay at all times when Almay represented to consumers that the Products were clean and free from harmful chemicals, including at the time the Challenged Statements were made. At all times relevant to this action, Revlon owned, and continues to own, 100% of Almay, Inc.[53]

---

[53] *See* REVLON 2020 ANNUAL REPORT, available at https://investors.revlon.com/financial-information/annual-reports

70.     During the relevant time period, Revlon maintained and updated the Almay website that contained the Challenged Statements.[54]

71.     Defendant Revlon was responsible for all research and development for the Almay Products during the relevant time period, including safety and quality testing on the Products.[55]

## TOLLING AND ESTOPPEL OF STATUTE OF LIMITATIONS

72.     As the creators, formulators, manufacturers, and sellers of the Products, Defendants have had actual knowledge for years that the Products contained potentially harmful chemicals such as PFAS.

73.     Defendants have conducted extensive testing on the Almay products and know or should know the ingredients in the Products.[56]

74.     Defendants boast about their awareness of their ingredients, priding themselves on how selective they are about their ingredients.[57]  In fact, Defendants claim to use fewer than 5% of the available ingredients to cosmetics companies.[58]

75.     Although Defendants were aware of the deception in its labeling given the inclusion of PFAS in their Products, they took no steps to warn  Plaintiffs or Class Members of such PFAS.

76.     Despite their knowledge, Defendants have fraudulently concealed the fact that Products contain PFAS.  Defendants had a duty to disclose the existence of the PFAS.

77.     Defendants made, and continue to make, affirmative misrepresentations to consumers, to promote sales of the Products, including that the Products meets the Challenged Statements.

---

[54] *Id*.
[55] *Id*.
[56] *These are our Values*, *supra* note 5.
[57] *Id.*
[58] *Id.*

78.     Defendants concealed material facts that would have been important to Plaintiffs and Class Members in deciding whether to purchase the Products.  Defendants' concealment  was knowing, and they intended to, and did, deceive reasonable consumers, including Plaintiffs and Class Members.   Accordingly, Plaintiffs and putative Class Members reasonably relied upon Defendants' concealment of these material facts and suffered  injury as a proximate result of that justifiable reliance.

79.     The PFAS in the formulation, design and/or manufacture of the Products was not reasonably detectible to Plaintiffs and putative Class Members.

80.     At all times, Defendants actively and intentionally concealed the presence of PFAS and  failed  to   inform  Plaintiffs  or  putative  Class  Members  of  the  presence  of  the  PFAS. Accordingly, Plaintiffs and putative Class Members' lack of awareness was not attributable to a lack of diligence on their parts.

81.     Defendants' statements, words, and acts were made for the purpose of suppressing the truth that the Products contained potentially harmful chemicals.

82.     Defendants concealed the presence of PFAS in the Products for the purpose of delaying Plaintiffs and putative Class Members from filing a complaint on their causes of action.

83.     As a result of Defendants' active concealment of the PFAS and/or failure to inform Plaintiffs and putative Class Members of the PFAS, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.  Furthermore, Defendants are estopped from relying on any statutes of limitations in light of its active concealment of the potentially harmful and/or human-made nature of the Products.

84.     Further, the causes of action alleged herein did not occur until Plaintiffs and putative Class Members discovered that the Products contained PFAS.  Plaintiffs and putative

Class Members had no realistic ability to discern that the Products contained PFAS until they learned of the existence of the PFAS.  In either event, Plaintiffs and putative Class Members were hampered in their ability to discover their causes of action because of Defendants' active concealment of the presence of PFAS and true nature of the Products.

## FED. R. CIV. P. 9(b) ALLEGATIONS
## (Affirmative and By Omission)

85.     Although Defendants are in the best position to know what content they placed on their website(s) and in marketing materials during the relevant time period, and the knowledge that they had regarding the PFAS and their failure to disclose the presence of PFAS in the Products to consumers, to the extent necessary, Plaintiffs satisfy the requirements of Rule 9(b) by alleging the following facts with particularity:

86.     **WHO**: Defendants made material misrepresentations and/or omissions of fact through their labeling, website representations, third-party retailers, and marketing statements, which include the Challenged Statements by Defendants who misrepresented and omitted material information regarding harmful chemicals in the Products.

87.     **WHAT**: Defendants' conduct here was, and continues to be, fraudulent because it omitted and concealed that the Products contains PFAS, an ingredient that Defendants knew would be deemed inconsistent with the Challenged Statements it made to consumers as described herein. Thus, Defendants' conduct deceived Plaintiffs and Class Members into believing that the Products were consistent with the Challenged Statements.  Defendants knew or should have known this information is material to reasonable consumers, including Plaintiffs and Class Members in making their purchasing decisions, yet they continue to pervasively market the Products to consumers as clean when they are not.

88.     **WHEN**: Defendants made material misrepresentations and/or omissions during the relevant time period and at the time Plaintiffs and putative Class Members purchased the Products, and prior to and at the time Plaintiffs and putative Class Members made claims after realizing the Products contained harmful chemicals.

89.     **WHERE**: Defendants' marketing message was uniform and pervasive, carried through material misrepresentations and/or omissions on the labeling of their packaging, their website(s), and through marketing materials.

90.     **HOW**: Defendants made material misrepresentations and/or failed to disclose material facts regarding the Products, including but not limited to the presence of PFAS.

91.     **WHY**: Defendants made the material misrepresentations and/or omissions detailed herein for the express purpose of inducing Plaintiffs, putative Class Members, and all reasonable consumers to purchase and/or pay for the Products, the effect of which was that Defendants profited by selling the Products to many thousands of consumers.

92.     **INJURY**: Plaintiffs and Class Members purchased, paid a premium, or otherwise paid more for the Products when they otherwise would not have absent Defendants' misrepresentations and/or omissions.

### PLAINTIFFS' FACTUAL ALLEGATIONS

**Plaintiff Anderson's Experience**

93.     Plaintiff Kelly Anderson purchased the Products, including Almay Multi-Benefit Mascara™.  She purchased the Products most recently in September 2021, at a Walgreens in Rochester, Minnesota.

94.     Plaintiff Anderson was familiar with Almay, and had previously purchased Almay makeup, including the Products.

95.     Plaintiff Anderson purchased the Products based on her belief that the product was clean, natural, and free from harmful chemicals.

96.     Plaintiff Anderson was willing to pay the price she paid for the Products because she believed its purported "clean" formulation would not contain potentially harmful chemicals, such as PFAS.

97.     Plaintiff Anderson was specifically drawn to the Almay brand because of Defendants' clean marketing, which to Plaintiff Anderson, meant that the products would be free from harmful chemicals.  She looked at the product's packaging prior to her purchase, but nowhere on the packaging did Defendants disclose the presence of PFAS chemicals in the Products nor did Defendants disclose the product contains harmful chemicals.

98.     If Plaintiff Anderson had been aware of the presence of potentially harmful chemicals, like PFAS, in the Products, she would not have purchased the Products or would have paid significantly less.  Therefore, she did not receive the benefit of her bargain.

99.     As a result of Defendants' actions, Plaintiff Anderson has incurred damages, including economic damages.

**Plaintiff McCauley's Experience**

100.     Plaintiff Audrey McCauley purchased the Products, including Almay Clear Complexion™ Concealer.  She purchased the Products most recently January 2022 from a Walgreens near her home in Jacksonville, Florida.

101.     Plaintiff McCauley was familiar with Almay, and had previously purchased Almay makeup, including the Products.

102.     Plaintiff McCauley purchased the Products based on her belief that the product was clean, natural, and free from harmful chemicals.

103.    Plaintiff McCauley was willing to pay the price she paid for the Products because she believed its purported "clean" formulation would not contain potentially harmful chemicals, such as PFAS.

104.    Plaintiff McCauley was specifically drawn to the Almay product line because of its brand name and clean marketing, which to Plaintiff McCauley, meant that the products would be free from harmful chemicals.  Based on advertisements and branding, she believed that Almay was better than other brands because it was made from better ingredients, which were natural and cleaner.  Plaintiff McCauley looked at the product's packaging prior to her purchase, but nowhere on the packaging did Defendants disclose the presence of PFAS chemicals in the Products nor did Defendants disclose the product contains harmful chemicals.

105.    If Plaintiff McCauley had been aware of the presence of PFAS chemicals in the Products, she would not have purchased the Products or would have paid significantly less. Therefore, she did not receive the benefit of her bargain.

106.    As a result of Defendants' action, Plaintiff McCauley has incurred damages, including economic damages.

**Plaintiff Pokorski's Experience**

107.    Plaintiff Tania Pokorski purchased the Products, including Almay Clear Complexion™ Makeup.  She purchased the Products most recently December 2021 from a Target near her home in Carson, California.

108.    Plaintiff Pokorski was familiar with Almay, and had previously purchased Almay products, including the Products.

109.    Plaintiff Pokorski purchased the Products based on her belief that the product was clean, natural, and free from harmful chemicals.

110.    Plaintiff Pokorski was willing to pay the price she paid for the Products because she believed its purported "clean" formulation would not contain potentially harmful chemicals, such as PFAS.

111.    Plaintiff Pokorski was was specifically drawn to the Almay product line because of its brand name and clean marketing, which to Plaintiff Porkorski, meant that the products would be free from harmful chemicals.  Based on advertisements and branding, she believed that Almay was better than other brands because it was made from better ingredients, which were natural and cleaner.  Plaintiff Porkorski looked at the product's packaging prior to her purchase, but nowhere on the packaging did Defendants disclose the presence of PFAS chemicals in the Products nor did Defendants disclose the product contains harmful chemicals.

112.    If Plaintiff Pokorski had been aware of the presence of PFAS chemicals in the Products, she would not have purchased the Products or would have paid significantly less. Therefore, she did not receive the benefit of her bargain.

113.    On April 1, 2022, prior to the filing of this Complaint Plaintiff Pokorski put Defendants on written notice of her claims arising from violations of numerous provisions of California law, including the California Consumer Legal Remedies Act ("CLRA"), California Civil Code § 1770, *et seq*., as well as other causes of action.

114.    As a result of Defendants' actions, Plaintiff Pokorski has incurred damages, including economic damages.

## **CLASS ACTION ALLEGATIONS**

115.    Plaintiffs bring this action individually and as representatives of all those similarly situated, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3) on behalf of the following Nationwide Class:

> **During the fullest period allowed by law, all persons residing in the United States who purchased the Products for personal use and not for resale.**

116.    Plaintiff Anderson brings this action individually and as representative of all those similarly situated, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3) on behalf of the following Minnesota Class:

> **During the fullest period allowed by law, all persons residing in the State of Minnesota who purchased the Products for personal use and not for resale.**

117.    Plaintiff McCauley brings this action individually and as representative of all those similarly situated, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3) on behalf of the following Florida Class:

> **During the fullest period allowed by law, all persons residing in the State of Florida who purchased the Products for personal use and not for resale.**

118.    Plaintiff Pokorski brings this action individually and as representative of all those similarly situated, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3) on behalf of the following California Class:

> **During the fullest period allowed by law, all persons residing in the State of California who purchased the Products for personal use and not for resale.**

119.    Specifically excluded from these definitions are: (1) Defendants, any entity in which Defendants have a controlling interest, and their legal representatives, officers, directors, employees, assigns and successors; (2) the Judge to whom this case is assigned and any member of the Judge's staff or immediate family; and (3) Class Counsel.

120.     Plaintiffs reserve the right to modify the class definitions, if necessary, to include additional products with the same PFAS and/or other makeup products manufactured by Defendants with PFAS but bearing different brand names.

121.     **Numerosity**: Class Members are so numerous that joinder of all Members is impracticable.  While the exact number of Class Members is presently unknown, it likely consists of tens of thousands of people geographically disbursed throughout the United States.  The number of Class Members can be determined by sales information and other records.  Moreover, joinder of all potential Class Members is not practicable given their numbers and geographic diversity. Class Members are readily identifiable from information and records in the possession of Defendants and its authorized distributors and retailers.

122.     **Typicality**: The claims of the representative Plaintiffs are typical in that Plaintiffs, like all Class Members, purchased the Products that was formulated, manufactured, marketed, advertised, distributed, and sold by Defendants.  Plaintiffs, like all Class Members, have been damaged by Defendants' misconduct in that, *inter alia*, they have incurred or will continue to incur damage as a result of overpaying for the Products that was manufactured with potentially harmful, human-made chemicals, which makes the Products not what reasonable consumers were intending to purchase.  Furthermore, the factual basis of Defendants' misconduct is common to all Class Members because it engaged in systematic fraudulent behavior that was deliberate, includes negligent misconduct, and results in the same injury to all Class Members.

123.     **Commonality**: Common questions of law and fact exist as to all Class Members. These questions predominate over questions that may affect only individual Class Members because Defendants acted on grounds generally applicable to all Class Members.  Such common legal or factual questions include, *inter alia*:

a.   Whether the Products contains PFAS;

b.   Whether Defendants' practices in labeling and marketing the Products tends to mislead reasonable consumers into believing that the Products is clean and/or natural;

c.   Whether the Products are, in fact, clean and/or natural given that theycontains PFAS;

d.   Whether Defendants omitted or failed to disclose material information to Plaintiffs and Class Members regarding the Products;

e.   Whether Defendants concealed from and/or failed to disclose to Plaintiffs and Class Members that harmful chemicals are used in its Products;

Whether Defendants breached the implied warranty of merchantability relating to the Products;

f.   Whether Defendants' breached express warranties relating to the Products;

g.   Whether Defendants engaged in unfair, unconscionable, or deceptive trade practices by selling and/or marketing the Products containing harmful chemicals;

h.   Whether Defendants engaged in false or misleading advertising by selling and/or marketing the Products containing harmful chemicals;

i.   Whether Plaintiffs and Class Members are entitled to damages, including compensatory, exemplary, and statutory damages, and the amount of such damages;

j.   Whether Plaintiffs and Class Members either paid a premium for the Products that they would not have paid but for the false labeling and marketing of the Products or would not have purchased them at all;

k.   Whether Plaintiffs and the other Class Members have been injured and the proper measure of their losses as a result of those injuries; and

l.   Whether Plaintiffs and the other Class Members are entitled to injunctive, declaratory, or other equitable relief.

124.   **Adequate Representation**: Plaintiffs will fairly and adequately protect the interests of putative Class Members.  They have no interests antagonistic to those of putative Class Members. Plaintiffs retained attorneys experienced in the prosecution of class actions, including consumer and product PFAS class actions, and Plaintiffs intend to prosecute this action vigorously.

125.   **Injunctive/Declaratory Relief**: The elements of Rule 23(b)(2) are met. Declaratory and injunctive relief is appropriate in this matter.  Defendants have acted or refused

to act on grounds generally applicable to Plaintiffs and putative Class members, thereby making appropriate final injunctive relief and declaratory relief, as described herein, with respect to the putative Class Members as a whole.  Unless a class-wide injunction is issued, Defendants will continue to, or allow its resellers to, advertise, market, promote, and sell the Product in an unlawful and misleading manner, as described throughout this Complaint, and members of the Classes will continue to be misled, harmed, and denied their rights under the law.  Additionally, the fraud perpetrated by Defendants will continue to pose an ongoing threat to the public.

126.    Injunctive relief, and specifically public injunctive relief, is necessary in this Action.

127.    Plaintiffs have standing to make this claim because they may purchase the Products in the future provided that they were formulated without the PFAS.  Defendants have acted and refused to act on grounds that apply generally to the Classes, such that final injunctive relief and corresponding declaratory relief is appropriate respecting the Classes as a whole.

128.    If Defendants are allowed to continue the practices of manufacturing, marketing and selling the Products with the PFAS, and failing to disclose the PFAS to consumers, unless injunctive or declaratory relief is granted, Plaintiffs and putative Class Members will not have a plain, adequate, speedy, or complete remedy at law to address all of the wrongs alleged herein.

129.    Plaintiffs further seek injunctive and declaratory relief requiring Defendants to cease its unfair, deceptive and unlawful conduct, including the following:

  a.    Undertake an immediate public information campaign to inform consumers the truth about the PFAS, including at the time of sale of the Products;

  b.    Adequately disclose the PFAS to consumers at the time of sale of the Products; and

  c.    Remove the PFAS.

130.    Plaintiffs also seeks a declaration that the Products contain PFAS, which existed at the time of sale of the Products to consumers, which was known to Defendants and unknown to consumers.

131.    Plaintiffs and putatitve Class Members have been harmed and will experience irreparable future harm should Defendants' conduct not be enjoined because they will be unable to properly replace their Products with clean and natural components or replacement Products, and will have to bear the costs associated with the PFAS if Defendants continue to fail and refuse to provide adequate remuneration to consumers as a result of the PFAS, which exists at the time of sale of the Products.

132.    **Predominance and Superiority**: Plaintiffs and putative Class Members all suffered and will continue to suffer harm and damages as a result of Defendants' unlawful and wrongful conduct.  A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of their individual claims, it is likely that few Class Members could afford to seek legal redress for Defendants' misconduct.  Absent a class action, Class Members will continue to incur damages, and Defendants' misconduct will continue without remedy.  Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

133.    Plaintiffs know of no difficulty to be encountered in the maintenance of this  action that would preclude their maintenance as a class action.

134.     Defendants acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes appropriate.

## COUNT I
**Breach of Implied Warranty**
**(On Behalf of Plaintiffs and the Nationwide Class and,**
**In the Alternative, the State Subclasses)**

135.     Plaintiffs hereby adopt and incorporate by reference the allegations contained in paragraphs 1-134 as though fully set forth herein.

136.     Defendants were merchants and were at all relevant times involved in the manufacturing, distributing, warranting, and/or selling of the Products.

137.     The Products are goods within the relevant laws and Defendants knew or had reason to know of the specific use for which the Products, as goods, were purchased.

138.     The implied warranty of merchantability included with the sale of each Products product means that Defendants warranted that the Products would be fit for the ordinary purposes for which the Products were used and sold, and were not otherwise injurious to consumers, that the Products would pass without objection in the trade, be of fair and average quality, and conform to the promises and affirmations of fact made by Defendants.  This implied warranty of merchantability is part of the basis for the benefit of the bargain between Defendants, and Plaintiffs, and putative Class Members.

139.     Defendants breached the implied warranty of merchantability because the Products are not fit for their ordinary purpose as a reasonably clean makeup for consumers as the Products contains potentially harmful chemicals that could not reasonably be characterized as clean.

140.    The aforementioned problems associated with the Products constitute non-clean, potentially toxic makeup products, and therefore, there is a breach of the implied warranty of merchantability.

141.    Defendant's warranty expressly applies to the original purchaser and any succeeding owner of the Products, creating privity between Defendant on the one hand, and Plaintiffs and Class Members on the other.

142.    Nonetheless, privity is not required because Plaintiffs and Class Members are the intended beneficiaries of Defendants' warranties and their sale through retailers.  Defendants' retailers were not intended to be the ultimate consumers of the Products and have no rights under the warranty agreements.  Defendants' warranties were designed for and intended to benefit the consumer only and Plaintiffs and Class Members were their intended beneficiaries.

143.    More specifically, Defendants' intention that their warranties apply to Plaintiffs and Class Members as third-party beneficiaries is evident from the statements contained in their product literature, including their warranty.  Likewise, it was reasonably foreseeable that Plaintiffs and Class Members would be the intended beneficiaries of the Products and warranties.

144.    Defendants impliedly warranted that the Products were of merchantable quality and fit for such use.  These implied warranties included, among other things: (i) a warranty that the Makeup manufactured, supplied, distributed, and/or sold by Defendants were clean and/or natural; (ii) that the Makeup was non-toxic; and (ii) a warranty that the Products would be fit for their intended use while they were being used by consumers.

145.    Contrary to the applicable implied warranties, the Products, at the time of sale and thereafter, were not fit for their ordinary and intended purpose of providing Plaintiffs and putative

Class Members with makeup consisting of the Challenged Statements.  Instead, the Products

suffered, and continues to suffer, from a formulation, design and/or manufacture, as alleged herein.

146.    Defendants' failure to adequately repair or replace the potentially harmful Products

caused the warranty to fail in its essential purpose.

147.    Defendants breached the implied warranties because the Products were sold with

the PFAS, which substantially reduced and/or prevented the Products from being clean, natural,

and non-toxic.

148.    As a direct and proximate result of the foregoing, Plaintiffs and Class Members

suffered, and continue to suffer, financial damage and injury, and are entitled to all damages, in

addition to costs, interest and fees, including attorneys' fees, as allowed by law.

**<u>COUNT II</u>**
**Negligent Misrepresentation**
**(On behalf of Plaintiffs and the Nationwide Class and,**
**In the Alternative, the State Subclasses)**

149.    Plaintiffs hereby adopt and incorporate by reference the allegations contained in

paragraphs 1–148 as though fully set forth herein.

150.    Pursuant to New York law, Plaintiffs must prove the following for a negligent

misrepresentation claim: (1) a false statement of a material fact; (2) defendant's knowledge that

the statement was false; (3) defendant's intent that the statement induce plaintiffs to act; (4)

plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from

reliance on the statement.

151.    As a seller of the Products and a merchant, Defendants had a duty to give correct

information to Plaintiffs and Class Members regarding the truth and accuracy of the ingredients of

the Products.  Defendants had sole possession and control of this information and had a duty to

disclose it accurately to Plaintiffs and Class Members.

152.    Defendants represented that the Products being clean cosmetic products in the Challenged Statements and in all of its other uniform marketing representations when in reality, studies and testing have shown that it contained potentially harmful ingredients. Defendants knew, or should have known, that the Products contained non-clean, non-natural, and/or toxic ingredients.

153.    Defendants supplied the information that the Products were clean because those qualities were known by Defendants to be desired by Plaintiffs and putative Class Members to induce them to purchase the Products. Defendants knew that making these representations would induce customers to purchase their makeup over the makeup of competitors.

154.    The Plaintiffs and putative Class Members relied upon Defendants' representations, including the Challenged Statements described herein and all other uniform marketing representations, that the Products were clean and free from harmful chemcials. Further, this reliance was in fact to their detriment because the Plaintiffs and putative Class Members purchased the Products with harmful chemicals.

155.    Plaintiffs and Putative Class Members are entitled to all relief the Court deems proper as a result of Defendants' actions described herein.

**COUNT III**
**Fraud**
**(On behalf of Plaintiffs and the Nationwide Class and,**
**In the Alternative, the State Subclasses)**

156.    Plaintiffs hereby adopt and incorporate by reference the allegations contained in paragraphs 1–155 as though fully set forth herein.

157.    Plaintiffs bring this claim individually and on behalf of the Nationwide Class.

158.    Defendants knew or should have known that the Products contained potentially harmful ingredients, including PFAS chemicals.

159.   Defendants provided Plaintiffs and putative Class Members with false or misleading material information and failed to disclose material facts about the true nature of the Products, including the Challenged Statements.

160.   Defendants had exclusive knowledge of the Products's ingredients at the time of sale and at all other relevant times.  Neither Plaintiffs nor putative Class Members, in the exercise of reasonable diligence, could have independently discovered the true nature of the Products prior to purchase.

161.   Defendants had the capacity to, and did, deceive Plaintiffs and Nationwide Class Members, into believing they were purchasing makeup that was clean and free from harmful chemicals.

162.   Defendants undertook active and ongoing steps to conceal the presence of PFAS chemicals in the Products.  Plaintiffs are not aware of anything in Defendants' advertising, publicity, or marketing materials that disclosed the truth about the Products, despite Defendants' awareness of the problem.

163.   The facts concealed and/or not disclosed by Defendants to Plaintiffs and putative Class Members are material facts in that a reasonable person would have considered them important in deciding whether to purchase (or pay the same price for) the Products.

164.   Defendants intentionally concealed and/or failed to disclose material facts for the purpose of inducing Plaintiffs and putative Class Members to act thereon.

165.   Plaintiffs and putative Class Members justifiably acted or relied upon the concealed and/or nondisclosed facts to their detriment, as evidenced by their purchase of the Products.

166.   Plaintiffs and putative Class Members suffered a loss of money in an amount to be proven at trial as a result of Defendants' fraudulent concealment and nondisclosure because they

would not have purchased the Products, or would not have purchased the Products for the price

they did, if the true facts concerning the Products had been known.

167.    Plaintiffs and Nationwide Class Members are entitled to all relief the Court proper

as a result of Defendants' actions described herein.

## COUNT IV
### Violation of the California Consumer Legal Remedies Act ("CLRA")
### California Civil Code §§ 1750, *et seq.*
### (Plaintiff Pokorski Individually and on Behalf of the California Class)

168.    Plaintiff Pokorski hereby adopts and incorporates by reference the allegations

contained in paragraphs 1–167 as though fully set forth herein.

169.    The conduct described herein took place in the state of California and constitutes

unfair methods of competition or deceptive acts or practices in violation of the Consumer Legal

Remedies Act ("CLRA"), California Civil Code §§ 1750, *et seq.*

170.    The CLRA applies to all claims of Plaintiff Pokorski and California Class Members

because the conduct which constitutes violations of the CLRA by Defendants occurred within the

State of California.

171.    Plaintiff Pokorski, and California Class Members are "consumers" as defined by

Civil Code § 1761(d).

172.    Defendant are each a "person" as defined by California Civil Code § 1761(c).

173.    The Products qualifies as "goods" as defined by California Civil Code § 1761(a).

174.    PlaintiffPokorski, and the California Class Members' purchases of the Products are

"transactions" as defined by California Civil Code § 1761(e).

175.    As set forth below, the CLRA deems the following unfair methods of competition

and unfair or deceptive acts or practices undertaken by any person in a transaction intended to

result or which does result in the sale or lease of goods or services to any consumer unlawful:

    a.   "Representing that goods . . . have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities which they do no have."  Civil Code § 1770(a)(5); and

    b.   "Representing that goods . . . are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."  Civil Code § 1770(a)(7).

176.  Defendants engaged in unfair competition and/or unfair or deceptive acts or practices in violation of California Civil Code §§ 1770(a)(5) and (a)(7) when they represented, through their advertising and other express representations, that the Products had benefits or characteristics that it did not actually have.

177.  As detailed in the body of this Complaint, Defendants have repeatedly engaged in conduct deemed a violation of the CLRA, has made representations regarding the Products's benefits or characteristics that it did not in fact have, and has represented the Products to be of a quality that it was not.  Indeed, Defendants concealed this information from Plaintiff Pokorski and California Class Members.

178.  The Products were not and are not consistent with the Challenged Statements described herein and other uniform marketing representations made to consumers that the Products were clean and free from harmful chemicals. As detailed above, Defendants violated the CLRA when they falsely represented that the Products meets a certain standard or quality.

179.  Defendants further violated the CLRA when they advertised the Products with the intent not to sell it as advertised, and knew that the Products was not as represented.

180.  Specifically, Defendants marketed and represented the Products as clean and free of harmful chemicals when in fact the Products contains PFAS chemicals which are known to be potentially harmful to humans.

181.  Defendants' deceptive practices were specifically designed to induce Plaintiff Pokorski and California Class Members to purchase or otherwise acquire the Products.

182.    Defendants engaged in uniform marketing efforts to reach California Class Members, their agents, and/or third parties upon whom they relied, to persuade them to purchase and use the Products manufactured by Defendants.   Defendants' packaging, advertising, marketing, website, and retailer product identification and specifications contain numerous false and misleading statements regarding the quality and ingredients of the Products.   These include, *inter alia*, the Challenged Statements described herein.

183.    Despite these representations, Defendants omitted and concealed information and material facts from Plaintiff Pokorski and California Class Members.

184.    In their purchase of the Products, Plaintiff Pokorski and California Class Members relied on Defendants' representations and omissions of material facts.

185.    These business practices are misleading and/or likely to mislead consumers and should be enjoined.

186.    On April 1, 2022, Plaintiff Pokorski provided written notice to Defendants via certified mail through the United States Postal Service demanding corrective actions pursuant to the CLRA, but Defendants failed to take any corrective action.

187.    In accordance with California Civil Code § 1780(a), Plaintiff Pokorski and the California Class Members seek only injunctive and equitable relief for Defendants' violations of the CLRA, including an injunction to enjoin Defendants from continuing their deceptive advertising and sales practices.

188.    Pursuant to California Civil Code § 1780(a)(1)-(5) and § 1780(e), Plaintiff Pokorski, and California Class Members seek an order enjoining Defendants from the unlawful practices described above, a declaration that Defendants' conduct violates the Consumer Legal

Remedies Act, money damages, reasonable attorneys' fees and litigation costs, and any other relief the Court deems proper under the CLRA.

## COUNT V
**Violations of the California Unfair Competition Law ("UCL")**
**Cal. Bus. & Prof. Code §§ 17200, *et seq.***
**(Plaintiff Pokorski Individually and on Behalf of the California Class)**

189.    Plaintiff Pokorski hereby adopts and incorporates by reference the allegations contained in paragraphs 1–188, as though fully set forth herein.

190.    Plaintiff Pokorski brings this count on behalf of herself and the California Class.

191.    Defendants each are a "person" as defined by Cal. Bus. & Prof. Code § 17201.

192.    Plaintiff Pokorski and California Class Members who purchased Defendants' Products suffered an injury by virtue of buying products in which Defendants misrepresented and/or omitted the Products's true quality and ingredients.  Had Plaintiff Pokorski and California Class Members known that Defendants materially misrepresented the Products and/or omitted material information regarding the Products and its ingredients, they would not have purchased the Products.

193.    Defendants' conduct, as alleged herein, violates the laws and public policies of the state of California and the federal government, as set out in the preceding paragraphs of this complaint.

194.    There is no benefit to consumers or competition by allowing Defendants to deceptively label, market, and advertise the Products.

195.    Plaintiff Pokorski and California Class Members who purchased the Products had no way of reasonably knowing that the Products were deceptively packaged, marketed, advertised, and labeled and were therefore unsuitable for their intended use as a clean makeup product.  Thus,

Plaintiff Pokorski and California Class Members could not have reasonably avoided the harm they suffered.

196.     Specifically, Defendants marketed, labeled, and represented the Products clean and free from harmful chemicals when in fact the Products contain potentially harmful PFAS chemicals.

197.     The gravity of harm suffered by Plaintiff Pokorski and California Class Members who purchased the Products outweighs any legitimate justification, motive, or reason for packaging, marketing, advertising, and/or labeling the Products in a deceptive and misleading manner.  Accordingly, Defendants' actions are immoral, unethical, unscrupulous, and offend the established public policies of the state of California and the federal government. Defendants' actions are substantially injurious to Plaintiff Pokorski and California Class Members.

198.     The above acts of Defendants in disseminating said misleading and deceptive statements to consumers throughout the state of California, including to Plaintiff Pokorski and California Class Members, were and are likely to deceive reasonable consumers by obfuscating the true nature of Defendants' Products, and thus were violations of Cal. Bus. & Prof. Code §§ 17500, *et seq.*

199.     As a result of Defendants' unlawful, unfair and fraudulent acts and practices, Plaintiff Pokorski, on behalf of herself and the California Class, and as appropriate, on behalf of the general public, seeks injunctive relief prohibiting Defendants from continuing these wrongful practices, and such other equitable relief, including full restitution of all improper revenues and ill-gotten profits derived from Defendants' wrongful conduct to the fullest extent permitted by law.

**COUNT VI**
**Violation of the California False Advertising Law ("FAL")**
**Cal. Bus. & Prof. Code §§ 17500, *et seq.***
**(PlaintiffPokorski Individually and on Behalf of the California Class)**

200.    Plaintiff Pokorski hereby adopts and incorporates by reference the allegations contained in paragraphs 1–199 as though fully set forth herein.

201.    Plaintiff Pokorski brings this count on behalf of herself and the California Class.

202.    The conduct described herein took place within the state of California and constitutes deceptive or false advertising in violation of Cal. Bus. & Prof. Code §§ 17500, *et seq*.

203.    The FAL provides that "[i]t is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services" to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

204.    It is also unlawful under the FAL to make or disseminate any advertisement that is "untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." *Id*.

205.    Defendants, when they marketed, advertised, and sold the Products, represented to Plaintiff Pokorski and California Class Members as clean and free from harmful chemicals despite the fact that it contains potentially harmful, human-made PFAS chemicals.

206.    At the time of their misrepresentations, Defendants were either aware that the Products contained PFAS chemicals in direct contradiction to the Challenged Statements and other uniform marketing representations, or they were aware that they lacked the information and/or knowledge required to make such a representation truthfully.

207.    Defendants concealed, omitted, or otherwise failed to disclose this information to Plaintiff Pokorski and California Class Members.

208.    Defendants' descriptions of the Products were false, misleading, and likely to deceive Plaintiff Pokorski and other reasonable consumers.

209.    Defendants' conduct therefore constitutes deceptive or misleading advertising under the FAL.

210.    Plaintiff Pokorski has standing to pursue claims under the FAL as they reviewed and relied on Defendants' packaging, advertising, representations, and marketing materials regarding the Products when selecting and purchasing the Products.

211.    In reliance on the statements made in Defendants' advertising and marketing materials, and Defendants' omissions and concealment of material facts regarding the quality and use of the Products, Plaintiff Pokorski, and the California Class Members purchased the Products.

212.    Had Defendants disclosed the true nature of the Products, specifically, the presence of PFAS chemicals therein, PlaintiffPokorski, and California Class Members would not have purchased the Products or would have paid substantially less for it.

213.    As a direct and proximate result of Defendants' actions, as set forth herein, Defendants has received ill-gotten gains and/or profits, including but not limited to money from Plaintiff Pokroski, and California Class Members who paid for the Products containing PFAS chemicals.

214.    Plaintiff Pokorski and California Class Members seek injunctive relief, restitution, and disgorgement of any monies wrongfully acquired or retained by Defendants by means of their deceptive or misleading representations, including monies already obtained from Plaintiff Pokorski and California Class Members as provided for by the Cal. Bus. & Prof. Code § 17500.

### COUNT VII
### Violation of Florida's Deceptive and Unfair Trade Practices Act
### Fla. Stat. § 501.201 *et seq.*
### (Plaintiff McCauley and on Behalf of the Florida Class)

43

215.    Plaintiff McCauley hereby adopts and incorporates by reference the allegations contained in paragraphs 1–214 as though fully set forth herein.

216.    This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201 *et seq.* The stated purpose of this Act is to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." *Id*. § 501.202(2).

217.    Plaintiff McCauley and Florida Class Members are "consumers" and the transactions at issue in this Complaint constitute "trade or commerce" as defined by FDUTPA. *See id*. § 501.203(7)-(8).

218.    FDUTPA declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." *Id.* § 501.204(1).

219.    Defendants manufacture, distribute, market, advertise, and sell the Products. The Products is "goods" within the meaning of FDUTPA.

220.    For the reasons discussed herein, Defendants violated and continue to violate FDUTPA by engaging in the herein described unconscionable, deceptive, unfair acts or practices proscribed by Florida Statute §501.201, *et seq.* Defendants' acts and practices, including their omissions, described herein, were likely to, and did in fact, deceive and mislead members of the public, including consumers acting reasonably under the circumstances, to their detriment.

221.    Defendants engaged in unconscionable, unfair, deceptive, and unconscionable practices by, *inter alia*, making the Challenged Statements described herein which represent the Products as clean and free of chemicals and suitable for their intended use as a clean makeup when

44

the Products contain PFAS chemicals known to be harmful, in direct contradiction to Defendants'
representations.

222.    Defendants had exclusive knowledge of material facts concerning the presence of
PFAS in the products including as a result of the extensive testing they conducted on the Products.

223.    Defendants had exclusive knowledge of material facts concerning the Products
because Plaintiff McCauley and the Florida Class Members had no way of determining whether
PFAS was an ingredient in the Products.

224.    Defendants knew at the time of sale to Plaintiff McCauley and the Florida Class
Members that their products contained PFAS and were not suitable for their intended use.

225.    Despite Defendants' exclusive knowledge of material facts concerning the
existence of PFAS in the Products, Defendants actively concealed the presence of PFAS from
consumers by failing to disclose it as an ingredient to consumers.

226.    Plaintiff McCauley and the Florida Class Members purchased the Products after
performing research and viewing the product packaging.  Specifically, Plaintiff McCauley and the
Florida Class Members purchased the Products based, in part, on Defendants' representations that
the Products were clean and free from harmful chemicals. Plaintiff McCauley and the Florida Class
Members were unaware of the presence of PFAS chemicals in the Products at the time they
purchased the Products and had no reason to know of the presence of PFAS in the products at that
time.

227.    Defendants' practices described herein were likely to deceive, and did deceive,
consumers acting reasonably under the circumstances.  Consumers, including Plaintiff McCauley
and Florida Class Members, would not have purchased the Products, or would have paid less for
them, had they known that the Products contained PFAS as an ingredient.

228.    Defendants' violations described herein present a continuing risk to Plaintiff McCauley, Florida Class members, and the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

229.    As a result of Defendants' misconduct, Plaintiff McCauley and Florida Class Members have been harmed and suffered actual damages, including economic damages, resulting from the loss of the product, loss of use of the product, and loss of the benefit of their bargain.

230.    As a direct and proximate result of Defendants' unfair or deceptive acts or practices, Plaintiff McCauley and Florida Class Members have been damaged, and are entitled to recover actual damages to the extent permitted by law, including class action rules, in an amount to be proven at trial.

231.    Plaintiff McCauley and Florida Class Members seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Florida UDTPA and applicable law.

### COUNT VIII
### UNFAIR AND DECEPTIVE TRADE PRACTICES IN VIOLATION OF MINNESOTA CONSUMER FRAUD ACT
### (MINN. STAT. § 325F., *et seq*.)
### (Plaintiff Anderson and on Behalf of the Minnesota Class)

232.    Plaintiff Anderson hereby adopts and incorporates by reference the allegations contained in paragraphs 1–231 as though fully set forth herein.

233.    Minn. Stat. § 325F.69, Subdivision 1 provides:

The act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is enjoinable as provided in Section 325F.70.

234.    The Products Defendants sold to Plaintiff Anderson and Minnesota Class Members is considered merchandise under the Minnesota Consumer Fraud Act.

235.    Defendants' business practices, in designing, manufacturing, warranting, advertising, marketing, and selling the Products, of misrepresenting that the Products were clean and free from harmful chemicals even though Defendants knew and had substantial evidence to the contrary, including by making the Challenged Statements alleged herein, independently and collectively constitute the use of fraud, false promises, misrepresentations, misleading statements and deceptive practices and, thus, constitute multiple, separate violations of Minn. Stat. § 325F.69.

236.    Defendants' business practices, in manufacturing, warranting, advertising, marketing, and selling the Products while concealing, failing to disclose, suppressing or omitting material information, including the presence of PFAS in the products and Defendants' knowledge of the Defect, and misrepresenting the Products as clean in direct contradiction to the Challenged Statements and other uniform and consistent marketing representations, constitutes the use of fraud, false promises, misrepresentations, misleading statements and deceptive practices and, thus, constitute multiple, separate violations of Minn. Stat. § 325F.69.

237.    As the manufacturer of the Products, Defendants knew or should have known the Products contained the harmful PFAS chemicals, were not suitable for their intended use, and otherwise was not as warranted and represented by Defendants.  Defendants  had special knowledge of the material facts to which Plaintiff Anderson and Minnesota Class Members did not have, and could not have access to.  Thus, Defendants had a duty to disclose to Plaintiff Anderson and Minnesota Class Members the material facts that the Products contained PFAS chemicals at the time they were sold and continuously throughout the Class Period as Plaintiff

Anderson and Minnesota Class Members had the reasonable expectation that Defendants would disclose the presence of such an ingredient.

238.    Defendants' omissions and misrepresentations set forth in this Complaint are material in that they relate to information that would naturally affect the purchasing decisions or conduct of purchasers, including Plaintiff Anderson and Minnesota Class Members, regarding the Products.

239.    Had Plaintiff Anderson and Minnesota Class Members known of the presence of PFAS in the Products, they would not have purchased the Products, or would have paid less for the Products.

240.    Defendants possessed knowledge of the presence of PFAS in the Products prior to bringing the product to market, including upon information and belief, due to extensive testing performed by Defendants.  Defendants fraudulently, negligently, recklessly and/or intentionally concealed and/or failed to disclose the presence of PFAS in the Products for the purpose of inducing Plaintiff Anderson, Minnesota Class Members, and their agents, to rely thereon, and Plaintiff Anderson, Minnesota Class Members, and their agents, justifiably relied to their detriment upon the truth and completeness of Defendants' representations about the Products.  Plaintiff Anderson and Minnesota Class Members relied on Defendants' disclosure of all materials facts and not omission of any material information regarding the Products at the time of purchase of the Products.

241.    Defendants' fraudulent and deceptive practices repeatedly occurred in Defendants' trade or business and were capable of deceiving a substantial portion of the purchasing public.

242.    As a direct and proximate cause of Defendants' false and deceptive misrepresentations and omissions regarding the Products, Plaintiff Anderson and Minnesota Class Members have suffered actual injuries in that they purchased and used the Products.

243.    Separate from, and in addition to, their actual damages, Plaintiff Anderson and Minnesota Class Members' expectations were frustrated as a result of Defendants' omissions and misrepresentations, and Plaintiff Anderson and Minnesota Class Members did not receive what they expected to receive, which injury constitutes a loss.  Plaintiff Anderson and Minnesota Class Members are thus entitled to recover the difference between the actual value of the Products and the value the Products would have possessed had Defendants' representations about the quality, durability, and service life of the Products been true.

244.    Plaintiff Anderson's lawsuit, will confer a public benefit by way of notice to Class Members and other consumers nationwide regarding the true ingredients contained in the Products, notice of the presence of PFAS in the Products, and an ability to recover damages.

245.    As a result of Defendants' unlawful conduct, Plaintiff Anderson and Minnesota Class Members were injured and suffered damages.  Plaintiff Anderson and Minnesota Class Members are entitled to recover their actual damages, and costs and disbursements, including costs of investigation and reasonable attorneys' fees, as well as injunctive relief and other equitable relief, including restitution, as determined by the Court, pursuant to Minnesota law, including Minn. Stat. §§ 8.31, subd. 1 and 3a. and 325F.69.

### COUNT IX
### VIOLATIONS OF THE MINNESOTA
### UNIFORM DECEPTIVE TRADE PRACTICES ACT
### (Plaintiff Anderson Individually and on Behalf of the Minnesota Class)

246.    Plaintiff Anderson hereby adopts and incorporates by reference the allegations contained in paragraphs 1–243 as though fully set forth herein.

247.    Minn. Stat. § 325D.44, Subdivision 1 provides, in part, as follows:

Subdivision 1. A person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person:

. . . .

(5)    represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have…;

. . . .

(7)    represents that goods are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another . . .; or

. . . .

(13)    engages in any other conduct which similarly creates likelihood of confusion or of misunderstanding.

248.    Defendants' business practices, in manufacturing, advertising, marketing, and selling the Products, in misrepresenting material facts, including that the Products contains harmful PFAS chemicals in direct contradiction to the Challenged Statements, constitute multiple, separate violations of Minn. Stat. § 325D.44, subd. 1 (5), (7) and (13), including:

a.        Falsely representing that they have provided a complete list of all ingredients found in the Products but omitting that the Products contains PFAS;

b.        Falsely representing that the Products is of a particular standard, quality or grade when, in fact, they are not; and

c.        Creating the likelihood of confusion or of misunderstanding among consumers about the nature and quality of the Products, including that the Products are suitable for use as a clean beauty product when they are not.

249.    As the manufacturer of the Products, Defendants have special knowledge of the ingredients contained in the Products at the time of manufacture and testing.  Accordingly, Defendants had special knowledge of the material facts to which Plaintiff Anderson and Minnesota

Class Members did not have, and could not have access to. Thus, Defendants had a duty to disclose to Plaintiff Anderson and Minnesota Class Members the material facts that the Products contained PFAS chemicals at the time they were sold and continuously throughout the class period.

250.    Defendants engaged in the above conduct in the course of Defendants' business and this conduct was capable of deceiving a substantial portion of the consuming public.

251.    Defendants intended that Plaintiff Anderson and Minnesota Class Members would rely on their misrepresentations, concealment, warranties, deceptions and/or omissions regarding the Products.

252.    The facts concealed or not disclosed by Defendants were material facts in that Plaintiff Anderson, Minnesota Class Members, and any reasonable consumer would have considered them in deciding whether to purchase the Dishwashers.

253.    Had Plaintiff Anderson, Minnesota Class Members, and the consuming public known that the Products contained harmful PFAS chemicals as an ingredient, they would not have purchased the Products or would have paid less for them.

254.    Accordingly, Plaintiff Anderson's lawsuit will confer a public benefit by way of notice to Class Members and other consumers nationwide regarding the presence of PFAS in the Products, notice of PFAS, and an ability to recover of damages.

255.    As a result of Defendants' unlawful conduct, Plaintiff Anderson and Minnesota Class Members were injured and suffered damages, and are entitled to recover their actual damages, costs and disbursements, including costs of investigation and reasonable attorneys' fees, as well as injunctive relief and other equitable relief, including restitution, as determined by the Court, pursuant to Minnesota law, including Minn. Stat. §§ 8.31, subd. 1 and 3a. and 325D.45.

<u>**COUNT X**</u>
**VIOLATIONS OF THE MINNESOTA UNLAWFUL TRADE PRACTICES ACT**

**(Plaintiff Anderson Individually and on Behalf of the Minnesota Class)**

256.    Plaintiff Anderson hereby adopts and incorporates by reference the allegations contained in paragraphs 1–253 as though fully set forth herein.

257.    Minn. Stat. § 325D.13 provides, in part, as follows:

No person shall, in connection with the sale of merchandise, knowingly misrepresent, directly or indirectly, the true quality, ingredients or origin of such merchandise.

258.    Defendants knowingly misrepresented and concealed the true quality of the Products in connection with the sale of that merchandise.

259.    Defendants knowingly misrepresented that the Products was consistent with the Challenged Statements.

260.    Defendants knowingly concealed from and failed to disclose to Plaintiff Anderson and Minnesota Class Members, in connection with the sale of Products, material information, including the presence of harmful PFAS chemicals in the Products.

261.    Defendants' omissions and misrepresentations had the tendency or capacity to deceive or mislead Plaintiff Anderson, Minnesota Class Members, their agents, and a substantial segment of the public.

262.    Defendants' omissions and misrepresentations were material because they related to facts that would naturally affect the conduct of purchasers and that a reasonable person, including Plaintiff Anderson and Minnesota Class Members, and their agents, would have considered important in deciding whether to purchase the Products.

263.    Defendants caused the Products to enter into interstate commerce.

264.    Had Plaintiff Anderson, Minnesota Class Members, and the consuming public known about the presence of PFAS as an ingredient in the Products, they would not have purchased the Products or would have paid less for them.

265.    As a result of Defendants' unlawful conduct, Plaintiff Anderson and Minnesota Class Members were injured and suffered damages, and are entitled to recover their actual damages, costs and disbursements, including costs of investigation and reasonable attorneys' fees, as well as injunctive relief and other equitable relief, including restitution, as determined by the Court, pursuant to Minnesota law, including Minn. Stat. §§ 8.31, subd. 1 and 3a. and 325D.15.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully requests that this Court:

A.    Certify the Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Name Plaintiffs as Class Representatives of the Classes;

C.    Name Plaintiffs' counsel as Class Counsel for the Classes;

D.    Award damages, including compensatory, exemplary, and statutory damages, to Plaintiffs and the Classes in an amount to be determined at trial;

E.    Permanently enjoin Defendants from engaging in the wrongful and unlawful conduct alleged herein;

F.    Award Plaintiffs and the Classes their expenses and costs of suit, including reasonable attorneys' fees to the extent provided by law;

G.    Award Plaintiffs and the Classes pre-judgment and post-judgment interest at the highest legal rate to the extent provided by law; and

H.    Award such further relief as the Court deems appropriate.

## <u>JURY DEMAND</u>

Plaintiffs demand a trial by jury on all issues so triable.

Dated: April 1, 2022                Respectfully submitted,

*/s/ Andrei Rado*
Andrei Rado
**MILBERG COLEMAN BRYSON PHILLIPS
GROSSMAN PLLC**
100 Garden City Plaza
Suite 500
Garden City, NY 11530
https://www.milberg.com
Phone: 212-594-5300
Fax: 212-868-1229


Melissa S. Weiner
**PEARSON, SIMON & WARSHAW, LLP**
800 LaSalle Avenue, Suite 2150
Minneapolis, Minnesota 55402
Telephone: (612) 389-0600
*mweiner@pswlaw.com*

Rachel Soffin*
**MILBERG COLEMAN BRYSON PHILLIPS
GROSSMAN PLLC**
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
T: 865-247-0080
F: 865-522-0049
rsoffin@milberg.com

Harper T. Segui*
**MILBERG COLEMAN BRYSON PHILLIPS
GROSSMAN PLLC**
825 Lowcountry Blvd., Suite 101
Mt. Pleasant, SC 29464
T: 919-600-5000
hsegui@milberg.com

Erin Ruben*
**MILBERG COLEMAN BRYSON PHILLIPS**
**GROSSMAN PLLC**
900 W. Morgan Street
Raleigh, NC 27603
T: 919-600-5000
eruben@milberg.com
*Application to be admitted pro hac vice is forthcoming*

*Attorneys for Plaintiffs & Proposed Classes*